QUINN EMANUEL URQUHART & SULLIVAN, LLP
Diane Cafferata (SBN 190081)
dianecafferata@quinnemanuel.com
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017-2543
Telephone:  (213) 443-3000
Facsimile:   (213) 443-3100

KELLER/ANDERLE LLP
Jennifer L. Keller (SBN 84412)
jkeller@kelleranderle.com
Steven J. Aaronoff (SBN 158921)
saaronoff@kelleranderle.com
18300 Von Karman Avenue, Suite 930
Irvine, California 92612
Telephone:  (949) 476 8700
Facsimile:   (949) 476 0900

Attorneys for Plaintiffs ELEANOR DE LEON, individually,
and as guardian *ad litem* for AA, a minor

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA, SOUTHERN DIVISION

| | |
|---|---|
| Eleanor de Leon, individually and as guardian ad litem for AA, a minor,<br><br>Plaintiff,<br><br>vs.<br><br>Ayman Ismail Abudawood, an individual; Anas Ismail Abudawood, an individual, Al Wafra, International Company for Industrial Investments Limited, a Saudi Arabia corporation; Al Safwa International Company for Industrial Investments Limited, a Saudi Arabia Company, Does 1 through 10, et al.<br><br>Defendants. | CASE NO. 8:18cv01030<br>**COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF FOR:**<br>**1. FRAUD;**<br>**2. CIVIL RICO;**<br>**3. BREACH OF FIDUCIARY DUTY;**<br>**4. CONSTRUCTIVE FRAUD;**<br>**5. BREACH OF REPRESENTATIVE'S DUTIES;**<br>**6. BREACH OF ORAL AGREEMENT**<br>**7. PROMISSORY ESTOPPEL;**<br>**8. INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE;**<br>**9. CONVERSION;**<br>**10. FRAUDULENT CONCEALMENT**<br><br>**AND JURY DEMAND**<br><br>Trial Date:      None Set |

**<u>INTRODUCTION</u>**

1.      Eleanor de Leon and AA ("Plaintiffs"), mother and daughter and both heirs of the late Sheikh Osama Ismail Abudawood ("the Deceased" or "Sheikh Osama"), sue Ayman Abudawood and Anas Abudawood ("Defendants"), who are brothers of Sheikh Osama.[1]  Before his death, Sheikh Osama asked his brothers to promise they would ensure Plaintiffs were bought out of their interest in his estate at fair market value.  The Defendants agreed.

2.      Unfortunately, Defendants refused to honor their deathbed pledges to Sheikh Osama.  Instead of buying out the Plaintiffs' interest in Sheikh Osama's estate at fair market value, Defendants have co-opted the family-owned, worldwide conglomeration of associated businesses and corporations, including the corporate defendants in this case and their associated corporate alter egos (collectively "the Abudawood Group") to advance their illegal scheme.  Collectively, the Abudawood Group is worth billions of dollars. Defendants have also engaged in unlawful, intentional, and concerted conduct to cause Plaintiffs emotional and financial duress in an effort to force Plaintiffs to accept far below fair market value for their interest in the estate, and to acquiesce to the Defendants' incompetent and destructive mismanagement of the estate and its assets.  Through their scheme to defraud Plaintiffs, in violation of both state and federal laws, Defendants directed their tortious conduct to residents of the state of California.

**<u>JURISDICTION AND VENUE</u>**

3.      This Court has subject matter jurisdiction over this action for federal question claims under 28 U.S.C. § 1331 and 18 U.S.C. §1964.  The Court also has subject matter over this action for state law claims based on complete diversity of citizenship under 28 U.S.C. §1332(a)(2).

[1] AA is the minor daughter of Plaintiff de Leon and Sheikh Osama.  There are no conflicts between them and, accordingly, Plaintiff de Leon's request to be appointed AA's guardian ad litem has been filed concurrently with this action.

4.     There is complete diversity between the parties.  Plaintiffs are both citizens of the United States and are residents of and domiciled in California.  The named individual Defendants are both citizens and residents of the Kingdom of Saudi Arabia.  The named entity defendants are corporations existing under the laws of Saudi Arabia, with their principal place of business in Jeddah, Saudi Arabia.  The amount in controversy exceeds seventy-five thousand dollars ($75,000.00).

5.     Personal jurisdiction and venue are proper in this district because Defendants' tortious conduct took place in Orange County, California and Plaintiffs' injuries accrued in Orange County, California.

## PARTIES

6.     Plaintiff Eleanor de Leon ("de Leon") is a citizen of the United States and a resident of California.  She was married to the Deceased for 23 years, and is the sole widow and one of the designated heirs of the Deceased, who died intestate in Saudi Arabia, intending his estate to be distributed in accordance with Sharia inheritance laws.

7.     Plaintiff AA, a minor, is a citizen of the United States and a resident of California.  She is one of five children of the Deceased and one of his designated heirs under Sharia inheritance laws.

8.     Defendant Ayman Ismail Abudawood ("Ayman") is a citizen and resident of Saudi Arabia and one of two surviving brothers of the Deceased.  He is one of two directors of the Abudawood Group – a multi-billion dollar family-owned conglomeration of companies – and one of its largest shareholders, with an 18.23% ownership interest.  Ayman is not an heir of the Deceased.  Ayman also has a power of attorney for the mother of the Deceased, who owns 18.459% of the Abudawood Group, giving Ayman effective control over her ownership interest.

9.     Defendant Anas Ismail Abudawood ("Anas") is a citizen and resident of Saudi Arabia and one of two surviving brothers of the Deceased.  He is one of

Case No.
COMPLAINT FOR DAMAGES

1  two directors of the Abudawood Group and one of its largest shareholders, with an

2  18.23% ownership interest. Anas is not an heir of the Deceased.

3      10.   Defendants Abudawood Offshore Trading Limited, Al Wafra

4  International Company of Industrial Investments Limited, Moh'd Ali Abudawood &

5  Partners for Industry Company Limited, National Cleaning Products Company

6  Limited, Al Safwa International Company for Industrial Investments Limited,

7  Modern Industries Company Limited, and Modern Products Company Limited

8  (collectively "Defendant Companies") are Saudi Arabian entities that share common

9  ownership and are alter egos.  Collectively, these entities comprise a small subset of

10 The Abudawood Group (hereinafter, referred to as "the Company"), which is

11 composed of more than sixty corporate entities.  The Defendant Companies

12 manufacture, and distribute a wide array of consumer products throughout the

13 Middle East.  The brands include Procter & Gamble, Pepsi, Quaker Oats and many

14 more.  Plaintiff reserves its rights to amend its Complaint to add the names of the

15 other corporate entities that are wholly owned or otherwise associated with

16 Abudawood Group and the Defendant Companies and are corporate alter egos.

17     11.   Plaintiffs are presently unaware of the true names and capacities of

18 defendants Does 1 through 10, inclusive, and accordingly sues said defendants by

19 such fictitious names.  Plaintiff will seek leave to amend this complaint to set forth

20 the true names and capacities of said defendants when ascertained and as necessary.

21 Each of the fictitiously named Doe defendants is responsible in some manner for the

22 wrongful conduct alleged herein.  Each Doe defendant acted in concert with, as

23 agent or representative for, or at the request or on behalf of another defendant.  Each

24 charging allegation contained herein is, therefore, also hereby alleged against each

25 fictitiously named Doe defendant.

26

27

28

Case No.
COMPLAINT FOR DAMAGES

# **FACTUAL ALLEGATIONS**

**A.**     **Sheikh Osama's Wishes for a Buyout**

12.     On June 13, 2017, Sheikh Osama, the head of the Company, died intestate in Jeddah, Saudi Arabia, with his express wish being that his estate be administered in accordance with Sharia inheritance laws.  Before passing away, Sheikh Osama conveyed to de Leon, Ayman, Anas, and Sheikh Osama's and Ms. de Leon's personal attorney, Jeffrey Trinklein ("Trinklein") of Gibson Dunn & Crutcher, LLP, his wish that Ms. de Leon and AA be bought out of their interest in the Abudawood Group, his other business holdings, real estate, and other assets at fair market value upon his death.

13.     Under Saudi Arabian law, when a closely-held company with Saudi owners admits a foreigner as an owner, the company must be recapitalized with an infusion of equity from all the owners.  As de Leon is not a Saudi citizen, her inheritance of a portion of Sheikh Osama's interest in the Company and its subsidiaries in Saudi Arabia would have forced a recapitalization of the Company by all of its owners.  To prevent this outcome, as well as to spare his wife and daughter from having all of their assets and distributions subject to the control of his brothers, Sheikh Osama insisted on and received a promise from his brothers Ayman and Anas  that both de Leon and their daughter, AA, be bought out at fair market value (the "Buyout").

14.     Under Sharia law, heirs inherit according to strict percentages based upon their relationship to the deceased.  The Saudi Ministry of Justice's personal status court in Jeddah identified all of Sheikh Osama's heirs.  The percentage of the Deceased's estate to which each of the heirs was entitled was then calculated according to Sharia inheritance law.  Under these calculations, de Leon is entitled to 12.5% of Sheikh Osama's entire estate.  AA is separately entitled to 11.805% of Sheikh Osama's entire estate.

Case No.
COMPLAINT FOR DAMAGES

15.     Ayman and Anas wrongfully assumed the *de facto* role of administrators of Sheikh Osama's estate and presented themselves as such to all of the Deceased's heirs (his mother, de Leon, AA, and his four other children from a previous marriage) in a June 22, 2017 letter.  Under Saudi law, an administrator is only appointed to handle the affairs of the estate with unanimous consent of the heirs.  No such consent was ever given by the heirs to appoint Ayman or Anas as administrators of Sheikh Osama's estate.  Ayman and Anas had no legal authority to present themselves as the administrators of the estate or to take legal actions on behalf of the estate.  But de Leon, who is not a Saudi citizen and was unfamiliar with Saudi law, was never advised to the contrary by Trinklein or any other attorney with knowledge of the relevant law.  Plaintiffs therefore reasonably believed that Ayman and Anas had this estate administration authority under the law.  In their June 22, 2017 letter, Defendants expressly promised to "prepare the groundwork for the distribution of [Sheikh Osama's] assets."  They further promised to "work with [de Leon] to make the process as comprehensive as possible in dealing with your specific concerns."  Plaintiffs received a copy of this letter.

16.     Trinklein, despite having previously served as Sheikh Osama's and Ms. de Leon's personal attorney and having handled personal legal work on their behalf (including setting up the LLC through which de Leon owns her home in California, keeping track of Sheikh Osama's personal calendar to ensure he did not remain in the United States long enough in any calendar year to incur liability for U.S. taxes, and other work of a purely personal nature), began holding himself out as acting on behalf of the estate as to its administration.  Trinklein, who is based in London and New York, initiated all in-person meetings with de Leon's counsel, flew out to California, and stayed in hotels in Orange County or Century City, California on November 2, 2017, March 22, 2018, and May 2, 2018.  On November 2, 2017, during an in-person meeting in Orange County, California, with Plaintiffs and their attorney Margaret Ng, Trinklein confirmed that the Buyout was Sheikh Osama's

Case No.
COMPLAINT FOR DAMAGES

wish and that Defendants intended to honor that wish.  Trinklein told Ng at this meeting that he represented the Company and was present to facilitate matters relating to the estate.  Trinklein reiterated Defendants' intent to carry out the Buyout in accordance with Sheikh Osama's wishes again on March 22, 2018, and again on May 2, 2018, during meetings in Orange County, California.  During both of these meetings, Trinklein was simultaneously acting both as representative of the Company and secretly as an agent of the Defendants.

17.     The recitals of a term sheet presented by Trinklein, Ayman, and Anas, provided shortly after the meeting state "Sheikh Osama I. Abudawood communicated to his wife Eleanor, his trusted lawyer [*i.e.*, Trinklein], and his two brothers his wish for Eleanor and [AA]" was to sell their interest after his passing.

**B.      Ayman and Anas's Campaign of Abuse and Pressure**

18.     Despite their repeated promises to handle the estate in accordance with the Deceased's wishes and to carry "out his vision for the Abudawood Group and his family," Defendants immediately began a campaign of abuse of and pressure upon de Leon, AA, and all of Sheikh Osama's children.  This campaign began on the day of Sheikh Osama's death, when Ayman, Anas, and Trinklein called de Leon when she was in California and demanded that she come to Jeddah immediately to discuss the transition of the Companies and its assets.  In her grief, de Leon did not want to make the long journey to engage in business discussions.  She was shocked by the coldhearted and calculated demands of her husband's brothers and Trinklein, her and her husband Sheikh Osama's longtime attorney.  Despite her reticence, they continued to press and coerce her into travelling to Saudi Arabia.  De Leon received an anonymous text message shortly after these calls that warned her of danger, so she refused to travel to Jeddah, fearing for her safety.  Defendants demanded that she at least participate in a conference call and she reluctantly did so.  Knowing that she was still reeling from the death of her husband, Ayman and Anas callously bombarded her with business-related demands.

Case No.
COMPLAINT FOR DAMAGES

19.     Trinklein participated in this conference call, ostensibly now representing the Defendants' adverse interests, without ever informing de Leon that he was no longer acting as her husband's attorney.

20.     During this and subsequent calls and meetings, Defendants berated de Leon and threatened to cut her off from her income and all of her assets.  In a November 2017 letter they sent to de Leon at her address in California, Defendants told her she needed to sign seven documents granting Defendants power of attorney, which they admitted were "as broad as possible."  The purported reason for the breadth of these documents was to ensure they could not be challenged by local authorities.  Defendants promised to only use the powers of attorney to distribute Sheikh Osama's assets and continue day to day management of the Abudawood Group, plus any other actions de Leon wanted them to perform on her behalf.  Defendants further promised that, in exchange for de Leon's executing the power of attorney, she would be treated fairly in the buyout process in accordance with the desires of Sheikh Osama.  Both de Leon and Ng declined frequent telecommunications demands from Ayman and Trinklein that de Leon sign the requested powers of attorney.

21.     Before de Leon engaged Ng as her attorney, de Leon had interviewed multiple law firms in Saudi Arabia by telephone to represent her in respect of Saudi law.  Ayman, by telecommunications, discouraged de Leon from hiring her preferred Saudi counsel.  After de Leon engaged Ng, Ng arranged for de Leon to interview candidates for Saudi legal counsel.  Ayman again attempted to assert his influence over de Leon's selection of a Saudi attorney.

22.     Ayman instructed Trinklein to communicate with Ng, by email and telephone, to suggest Saudi counsel the family would prefer.  Trinklein arranged a conference call with Ng and his partner at Gibson Dunn, Mitri Najjar, to suggest to Ng that de Leon should consider retaining the Saudi law firm Al-Tamimi.  Trinklein and Najjar represented to Ng that while Gibson Dunn had worked with Al-Tamimi,

Case No.
COMPLAINT FOR DAMAGES

the Abudawood Group and Defendants had never engaged Al-Tamimi on their own behalf.  After De Leon declined to hire Al-Tamimi, she learned that the Abudawood Group or Defendants had in fact engaged Al-Tamimi in connection with negotiations over the Buyout.  Ayman continued to intimidate de Leon through various telecommunications into selecting Saudi counsel that met Ayman's approval and over whom Ayman knew he could exert his influence.  Ayman warned de Leon in multiple telephone calls that if she selected Saudi counsel who was not cooperative with Defendants, it would be detrimental to her, the family business, and would expose confidential information of the Abudawood Group and the Abudawood family.

23.   In reality, Defendants knew that, having frozen de Leon out of her homes in Saudi Arabia and France, and having reduced the household income de Leon and AA were receiving from the Abudawood Group to five percent of what it had been before Sheikh Osama's death, de Leon – a woman and a non-citizen – was unable to enforce her rights and interests in Saudi Arabia.

24.   Cut off from her resources and still deep in mourning, de Leon was hesitant to give such a broad power of attorney to her two brothers-in-law.  After months of continual pressure, exerted through frequent telecommunications to de Leon in Orange County, California by Ayman, Trinklein and family acquaintances in Saudi Arabia, she finally capitulated and gave the requested powers of attorney to two attorneys Ayman and Anas had selected: Kamal and Abdulaziz al Shukri.  To induce de Leon to relent, Defendants assured de Leon that if she signed the powers of attorney, the Buyout would occur in a couple of months.  Defendants further assured de Leon that these attorneys they had chosen would faithfully protect her interests.  Due to Ayman and Anas's representations and pressure, De Leon felt she had no choice but to retain these Saudi counsel and give them broad powers of attorney in order to effectuate the distribution of her and AA's inheritance.  Additionally, these lawyers are charging de Leon $25,000 per month although they

Case No.
COMPLAINT FOR DAMAGES

1  are performing no substantive work on her behalf.  Moreover, De Leon acted in

2  reliance upon Ayman and Anas's repeated promises that she would be treated fairly

3  in accordance with her late husband's wishes, including the sale of her interest in

4  Abudawood for fair market value.

5       25.    After Sheikh Osama's death, Ayman and Anas routinely and forcibly

6  entered Sheikh Osama and de Leon's longtime family home in Jeddah, Saudi Arabia

7  ("the Jeddah House") and intimidated the household staff.  In one instance, Ayman

8  and Anas coerced the staff to call de Leon, who was residing in the United States,

9  and demand the combination to five safes located within the Jeddah House.  The

10  house staff called de Leon in tears to report the event and relay the request.  Ayman

11  and Anas also changed the locks on all the doors of the Jeddah House but refused to

12  give de Leon a set of keys.  After Sheikh Osama's death, de Leon has returned to the

13  Jeddah House only once, during which she was not allowed to enter her own home

14  without the supervision of Ayman or Anas, or to stay there for the night.  Nor was

15  de Leon permitted to remove any of her personal belongings.

16       26.    Defendants similarly sent their agents to a villa owned separately by

17  AA in Jeddah.  De Leon and Sheikh Osama had arranged for this property to be

18  titled as AA's separate property shortly after her birth.  Despite the fact that this

19  property was in no way related to Sheikh Osama's estate, the Defendants sent men

20  to the house to force their way in and ransack the property in search of valuables.

21  They terrified the property caretaker who called de Leon in tears to tell them that the

22  men had forced him to let them in and were now searching the house, going through

23  AA's clothes and personal effects.  None of Sheikh Osama's property was at the

24  villa.  Defendants and their agents had no right to force entry or search it.  They

25  simply did so because they felt like they could control de Leon and AA as women

26  whose rights they did not need to respect.

27

28

Case No.
COMPLAINT FOR DAMAGES

27. More recently, a trusted friend in Saudi Arabia called de Leon and AA and warned them that Ayman was so enraged at Plaintiffs that they should never return to Saudi because this trusted friend was afraid for Plaintiffs' physical safety.

28. Defendants continued their efforts to pressure de Leon, AA, and Sheikh Osama's other children by reducing their monthly income, freezing them out of the family-owned homes where they previously resided, cutting off their access to capital, and attempting to pit them against one another by variously blaming different heirs for the reductions in distributions and the delays in settling the estate. In the May 2, 2018, meeting in Orange County, California and a May 22, 2018, telephone call with Plaintiffs and Plaintiffs' counsel, Defendants rejected de Leon's request for the distribution of Abudawood Group dividends and income to which Sheikh Osama's heirs were entitled.  As an excuse for delaying and low-balling a Buyout, they claimed the need to wait for forward-looking projections of the Abudawood Group's 2018 valuation, which they had arranged through the Saudi firm Onyx that provides the Abudawood Group with advice and accounting. Further discussion of the phony Onyx valuation is provided in Section C below. While starving out the other heirs, Defendants, who are in control of the Abudawood Group, continue to take extravagant distributions for themselves and charge their personal expenses, including Ayman's burgeoning collection of million-dollar "supercars," to the Abudawood Group.

29. Moreover, Defendants even ensured that Gibson Dunn's legal fees relating to the administration of Sheikh Osama's estate are charged personally against de Leon's interest in the estate.  Defendants falsely claimed these expenses were proper, and de Leon at first believed them, because she could not fathom that her and her husband's "trusted attorney" and his brothers would concoct such a scheme to defraud her.  Defendants have charged these expenses to Plaintiffs not just to defraud them, but in an attempt to prevent de Leon from being able to fight their efforts to minimize her and her daughter's share of the estate.  Ayman and

1   Anas undertook these efforts as part of their overall scheme to consolidate their
2   control over the Abudawood Group and reduce Sheikh Osama's heirs'
3   "interference" in their management of the Abudawood Group – by exercising their
4   legal rights.

5       30.   De Leon and her counsel, Ng, in Orange County made several
6   reasonable financial requests of Ayman, Anas and Trinklein.  These included an
7   increase in de Leon and AA's monthly allowance (as advances of the inheritance);
8   distribution of their share of accumulated dividends; and distribution of their share
9   of Sheikh Osama's compensation for his service on the Abudawood Group affiliated
10  boards and his 2017 salary.  Defendants denied all of these requests.  De Leon and
11  AA also asked to not be charged for the upkeep and operating expenses of the
12  family compound in Jeddah, from which Defendants had locked them and the other
13  heirs out, but continue to enjoy for themselves.  Defendants again flatly denied their
14  requests.

15      31.   When de Leon and AA traveled to Saudi Arabia at Defendants' behest
16  in order to sign the powers of attorney, Defendants ensured they were met at the
17  airport by a group of intimidating men from the Abudawood Group who surrounded
18  de Leon and AA, kept them away from the view of other travelers, and took them to
19  the hotel.  During the entire trip, de Leon and AA were frightened for their personal
20  safety.  They had never before been treated this way upon arriving in Jeddah.  Upon
21  arrival at the hotel, de Leon was given a cell phone by the men who escorted her and
22  told to use only that phone for the duration of her stay in the country.  De Leon was
23  advised by someone with knowledge that the Defendants were tracking her calls and
24  whereabouts with that cell phone.  During her entire stay there, de Leon noticed that
25  she and AA were under 24-hour surveillance by Company employees, even at the
26  hotel.  De Leon and AA's movements were confined to their hotel unless it was to
27  meet with the family or the Saudi attorney the Defendants had arranged for de Leon.
28

Case No.
COMPLAINT FOR DAMAGES

32.     During de Leon's first meeting with the attorney, Ayman arrived unannounced to intimidate de Leon and coerce her into giving up her rights under the Buyout process.  De Leon and AA felt restricted and frightened by the constant surveillance and their harsh treatment by Defendants. Defendants arranged for this surveillance and control over Plaintiffs to ensure that de Leon and AA understood they were now powerless in Saudi Arabia and had no ability to protect themselves there.  Defendants' harsh treatment of de Leon and AA has continued even as they have returned to California.  Over the course of nearly a year, Ayman and Anas have systematically ground down de Leon and AA, leaving them desperate and isolated, and forcing them to take whatever scraps Defendants begrudgingly provided.

**C.     The Phony Valuation**

33.     Knowing that Sharia law guarantees Plaintiffs fixed percentages of Sheikh Osama's estate, which cannot be changed,  Defendants can only effectuate their plan to cheat Plaintiffs through manipulation of the valuation of assets.

34.     In order to prevent the forced recapitalization of the Company that would be triggered by de Leon's taking an ownership interest, Ayman and Anas need to arrange the Buyout Sheikh Osama had requested.  But Defendants are determined to avoid a Buyout at the Abudawood Group's fair market value.  In order to cheat AA and de Leon out of as much money as possible, Defendants needed to depress the valuation for a group of companies that Forbes recently estimated was worth at least four billion dollars.  Defendants knew that they could not get a reputable, international accounting and advisory firm to provide the type of lowball valuation they sought.  Accordingly, and as noted above, Defendants turned to a tiny, obscure venture in Jeddah called Onyx Financial, over which they held enormous influence through past business dealings.  Defendants induced de Leon into agreeing to having Onyx perform the valuation by assuring her that the entity was very familiar with the Abudawood Group and had the resources to perform the

Case No.
COMPLAINT FOR DAMAGES

valuation.   Onyx represented the valuation would be completed in 3-4 months. More than seven months later, the valuation remains incomplete.   De Leon reasonably relied upon the Defendants' claims regarding the suitability of Onyx to perform the valuation.   Only later did it become apparent that Onyx was delaying the process and using incorrect valuation methods.   De Leon and AA have been harmed by this scam, which has delayed the distribution of their inheritance and left them at the financial mercy of the Defendants.

35.   Onyx, despite specializing in the needs of new ventures and small and medium enterprises (according to a statement by its CEO on its website), was retained by Defendants to provide a valuation for a complex, global conglomerate with lucrative licensing rights in multiple markets, manufacturing facilities, complex investment portfolios, and real estate holdings around the world.  A valuation of this type goes well beyond Onyx's competencies.

36.   For months Onyx delayed, claiming it was waiting for 2018 projections from Procter & Gamble and Clorox, the Abudawood Group's most important partners, although the 2017 date of death valuation was the only relevant number for purposes of the Buyout. Onyx, at Defendants' behest, stonewalled the valuation necessary before any of the heirs could receive their inheritance from Sheikh Osama's estate.  Defendants, the architects of this presently unavailable (but sure to be wildly diminished) valuation, blamed de Leon for the delay in asset distribution, telling the other heirs they would have been paid but for her insistence on seeing the valuation.  In this way, Defendants hope to deflect attention from their own mismanagement of the Company, and exert more pressure on de Leon.

37.   Sheikh Osama had wisely guided the Abudawood Group for years following the death of his father, its founder.  Sheik Osama, a business genius and workaholic who was widely respected by his many business partners and licensors, expanded the Abudawood Group his father founded into a powerhouse throughout the entire Middle East.  By contrast, his brothers Ayman and Anas had shown little

Case No.
COMPLAINT FOR DAMAGES

interest in or aptitude for management, but considerable interest in spending the Abudawood Group's money.  Now, with Sheikh Osama gone, Defendants, hungry to exercise power and demonstrate their importance, are bungling the Abudawood Group's business.  For example, the Defendant Companies have hemorrhaged key employees, who refuse to work under Defendants' inept leadership.  This incompetence poses an existential, continuing threat to the Abudawood Group.

38.    The Abudawood Group has long held the exclusive rights to manufacture and distribute Procter & Gamble and Clorox products in Saudi Arabia.  In recent times the licenses have expanded to include Egypt, Yemen, Iraq, Bahrain and Pakistan.  The Abudawood Group acquired those rights in other markets when family-owned companies in those countries fell into disarray after the deaths of their leaders.  Procter & Gamble, needing competence and stability at the helm of its partners, will not tolerate a licensee in chaos that risks damaging its valuable brand.

39.    Trinklein, acting as Defendants' representative, admitted to de Leon, AA, and their attorney, Ng, during a November 2, 2017, meeting that Sheikh Osama's estate was worth at least $1 billion.  He affirmed this amount in a second meeting with Ng on March 22, 2018.  But in a May 2, 2018 meeting in California that Defendants attended telephonically, Trinklein denied making that assertion.  Defendants and Trinklein now claimed, for the first time, that the estate is worth far less, though the Onyx "valuation" remains incomplete.  Defendants have doubled down on their earlier fraudulent representations that Sheikh Osama's holdings were far less valuable  than what they truly were.  This has all been done in order to deprive Plaintiffs of their rightful share of the inheritance.

**D.    The Attempt to Transfer Assets**

40.    With no end in sight for the valuation process, and with concern that there might be relevant statutes of limitations or other time-related defenses in foreign jurisdictions unfamiliar to the Plaintiffs and their counsel, de Leon and Ng sought a global tolling agreement from Defendants.  De Leon and her counsel's

hope was that such an agreement would allow time for the valuation of the Abudawood Group to be completed, after which a resolution could be pursued without the pressure of statutes of limitation and time-related defenses in foreign jurisdictions.

41.    In response to their good faith offer to continue negotiating, Trinklein (whose fees for his representation on behalf of Defendants are being charged to Plaintiffs) responded that the estate would immediately transfer title to all of Sheikh Osama's assets held in the Cayman Islands to the heirs, including ownership of the entities that  own most of the real estate assets outside of Saudi Arabia.  This transfer would result in each heir receiving title to shares amounting to a minority interest in various Cayman entities, and would also allow Defendants to continue wrongfully exercising absolute rights as the largest shareholders and owners in the Defendant Companies and the Cayman Island entities.  Moreover, by re-titling assets that could be more easily valued and liquidated for the purposes of the Buyout, Defendants could then claim that the Abudawood Group lacked the liquidity to buy de Leon and AA out in cash, and force them to accept an artificially depressed Buyout on very unfavorable terms, stretched out over many years.

42.    De Leon delivered a demand letter to Trinklein on June 7, 2018, requesting an immediate halt to all efforts to transfer title of the Cayman Island assets.  Defendants' attempts to transfer these assets are illegal under the Cayman Succession Law, which vested authority over Sheikh Osama's assets in the Cayman courts upon his death.  As no administrator has been appointed by a Cayman Islands court to administer Sheikh Osama's estate, Defendants' efforts to distribute these assets are expressly prohibited.

**Claims for Relief**

**FIRST CAUSE OF ACTION**
**(Fraud)**

43.    Plaintiffs restate all allegations above as though fully recited herein.

44.    In the days after Sheikh Osama's death, de Leon felt she had to trust his brothers to abide by her husband's wishes, and under duress gave a broad power of attorney to "her" lawyers (selected and foisted on her by Ayman and Anas). Ayman and Anas represented to de Leon that if she signed the power of attorney to their selected Saudi lawyer, de Leon Defendants would be able to effectuate the Buyout in accordance with Sheikh Osama's express wishes. These statements were made by Defendants with the express intention of inducing de Leon to rely on them and sign away her power of attorney. De Leon relied on Defendants' representations, and negotiated patiently with Ayman and Anas over the course of months, with the expectation, based on the express representations of Defendants, that her powers of attorney would be used to effectuate a fair buyout of her interest in the Abudawood Group and that Onyx would perform a fair valuation for the Buyout. She reasonably believed her brothers-in-law would not breach their agreement and defy the dying wishes of their older brother, who had provided so well for the entire family.

45.    In reality, Ayman and Anas made their false promises and representations to de Leon in order to coerce her to give a broad power of attorney to a Defendant-selected Saudi lawyer who is charging her $25,000 monthly for no work on her behalf and hire an unqualified firm to provide a lowball valuation that will force de Leon out at a pittance. This also enabled them to lie to the other heirs that de Leon was holding up the valuation and, therefore, their distributions; to use the power of attorney that de Leon granted to cut off her access to her assets; and to manipulate the valuation of the Abudawood Group that will be the basis for the Buyout.

46.    Ayman and Anas made these misrepresentations with knowledge of their falsity.  Ayman and Anas never intended to use the powers of attorney they obtained from de Leon for her benefit as they had claimed.  They never intended to have a proper valuation of the Abudawood Group performed as they promised to both Sheikh Osama and to de Leon.  They never intended to act in the best interest of the heirs to manage an orderly distribution of Sheikh Osama's estate.  Instead, they induced de Leon to sign away her powers of attorney so they could cut her off from her assets, and so they could effectuate buying her out at an artificially reduced price.

47.    Many of Defendants' fraudulent statements were made during conference calls with de Leon and Ng when they were in California, which Ayman and Anas participated in telephonically from outside the state.  Ayman and Anas also sent Trinklein and others to California as their representatives to participate in person in these meetings.

48.    Anas and Ayman dispatched their representatives Adnan Othman Omar, Manhal Charles Lolas, and Trinklein to Orange County to meet with Ng and other members of the law firm representing de Leon on May 2, 2018.  Ng's firm argued against an in-person meeting, wanting to protect de Leon from Ayman and Anas's intimidation tactics.  Ayman and Anas coerced Ng into accepting the May 2 in-person meeting by threatening to withhold the Buyout Term Sheet they previously promised.  In the Term Sheet they presented, Defendants attempted to force Plaintiffs to agree to the terms of the Buyout "blind," in that the valuation had not been completed.

49.    As counsel to the ***Abudawood Group***, and upon information and belief, at the direction of Anas and Ayman, Gibson Dunn charged ***de Leon and AA*** $260,000 in the last year for the "benefit" of handling estate-related issues.  Anas and Ayman have used Gibson Dunn's legal work to perpetrate their fraud against de Leon and AA and have charged de Leon and AA over a quarter of a million dollars

for the privilege.  At the time of this filing, they continue to do so.  Defendants have been slow to reimburse de Leon for her legal expenses, even from her own assets in the estate, and have insinuated that if de Leon resists their fraudulent actions or enforces her rights, they will freeze *all* access to the funds she requires for de Leon and AA's living, educational, and legal expenses.

50.    Anas and Ayman manifested their intent to deprive de Leon and AA of the fair market value of their interests in the estate when they moved to force distribution of assets in the Cayman Islands, and without waiting for Onyx to complete its valuation.  They have attempted this maneuver even though they cannot legally do so in the Cayman Islands without a probate procedure, as these assets have legally been under the jurisdiction of the Cayman courts in accordance with the Cayman Succession Law.

51.    Anas and Ayman have further injured de Leon and AA by depriving them of distributions to which they are entitled based on their interest in the estate, unreasonably delaying the settling of the estate, locking them out of their real property in Saudi Arabia and Europe, freezing their access to their assets, and making outrageous and unjustifiable charges against their interest in the estate. These charges include Gibson Dunn's legal fees, the fees of the Saudi attorneys to whom de Leon was forced to give powers of attorney who are doing no substantive work on her behalf, as well as the operating expenses of real estate to which Plaintiffs have no access.

52.    As a direct result of Defendants' statements, and as a result of de Leon's reliance on these statements, de Leon has been financially harmed.  De Leon has had her assets frozen, she has been charged exorbitant legal fees for Gibson Dunn and her Saudi lawyers' actions (which did not represent her best interest), and she has been subject to Defendant's fraudulent scheme to devalue her interest in the Abudawood Group.  In performing the acts described herein, the defendants acted with oppression, fraud and malice.

### SECOND CAUSE OF ACTION
#### (Civil RICO Violations)

53.     Plaintiffs restate all allegations above as though fully recited herein.

54.     Defendants have personally profited by preventing de Leon, AA, and the other heirs from exercising their ownership rights in the assets of the estate, allowing Ayman and Anas to exploit the benefits of their brother's estate for themselves as the sole surviving directors of the Abudawood Group.  They have excluded the heirs from their rightful possession of their own property, allowing Ayman and Anas to use those properties themselves and charging the heirs for the upkeep and operating expenses.  While freezing out the other heirs, Defendants, who are in control of the Defendant Companies, continue to take extravagant distributions for themselves and charge their personal expenses, including Ayman's burgeoning collection of million-dollar "supercars," to the Abudawood Group.

55.     Ayman and Anas have partnered with each other and with the Abudawood Group and/or with companies within the Abudawood Group, and with other Does, as a criminal enterprise to perpetuate their scheme to defraud de Leon, AA, and the other heirs.  Defendants have already used the Defendant Companies to cause injury to de Leon and AA by depriving them of valuable Abudawood Group disbursements to which they are entitled.   Defendants have also made use of the Defendant Companies and manipulated Defendant Companies' resources as they sought to acquire an artificially low valuation of the Abudawood Group in order to force de Leon and AA out at a fraction of the true value of their inheritance.

56.     The numerous fraudulent misrepresentations described above, which occurred over an extended period of time, were committed by Defendants via interstate wires, including telephone calls and text messages made to the plaintiffs in California and through emails sent to them in California, constituting federal wire fraud.  These acts of wire fraud, as defined in 18 U.S.C. §1343, constitutes predicate

acts for the purposes of civil RICO under 18 U.S.C § 1964 and were part of a pattern of fraudulent and illegal activity.

57.    As a direct result of Defendants' pattern of activity, de Leon suffered significant financial harm.  De Leon has had access to her assets frozen, she has been charged exorbitant legal fees for Gibson Dunn and her Saudi lawyers' actions (which did not represent her best interest), and she has been subject to Defendant's fraudulent scheme to devalue her interest in the Abudawood Group.  Moreover, Defendants have manipulated the Abudawood Group so as to cut off significant corporate disbursements from de Leon, and have instead taken significant disbursements for themselves.   In performing the acts described herein, the defendants acted with oppression, fraud and malice.

### THIRD CAUSE OF ACTION
#### (Breach of Fiduciary Duty)

58.    Plaintiffs restate all allegations above as though fully recited herein.

59.    Ayman and Anas Abudawood, as the sole directors of the closely-held Abudawood Group, including the Defendant Companies, as well as business and real estate companies organized in the United States, owe a fiduciary duty to all beneficial owners of the Abudawood Group entities, including de Leon and AA.

60.    Defendants, as sole directors of the Defendant Companies, have a duty to act on behalf, and in the best interests of the owners of the Company, including defendants.

61.    Ayman and Anas have improperly cut off all disbursements to the beneficial owners of the Company, placing de Leon and AA in a state of financial duress created solely by Ayman and Anas.  Ayman and Anas acted with the express intent to force de Leon and AA to acquiesce to their wishes in the management and operation of the Company, which is a breach of Ayman and Anas's fiduciary duties.

62.    By choosing an unqualified firm beholden to Ayman and Anas to perform a sham valuation of the Abudawood Group, resulting in endless delays and

uncertainty, Ayman and Anas are further exposing the heirs, including de Leon and AA, to financial duress, including the potential for a recapitalization demand that they cannot meet.  Ayman and Anas claim the valuation is being delayed by the pending 2018 Proctor & Gamble and Clorox five-year projections.  Valuation standards do not allow 2018 information, which was not available in 2017, to be used to determine 2017 date of death value.  These actions imperil the Abudawood Group by subjecting the estate to unnecessary claims and distracting from the orderly management of the business.  Poor management by Ayman and Anas has caused top management and talent to flee from the Abudawood Group, harming its future profitability and jeopardizing its key strategic relationships.

63.     Additionally, the dragging out of this process, the Defendants' efforts to turn the heirs against each other (by blaming de Leon for the delay in the valuation and stating that was what was holding up distributions, when de Leon had no control over the process), and their effort to acquire a lowball valuation number, all imperil the Abudawood Group's most valuable asset: its licensing agreements and partnership with Procter & Gamble.  As Procter & Gamble shifted licensing rights to Abudawood Group from entities in UAE and Egypt precisely because the previous license holders were unable to continue functioning smoothly due to the deaths of their leaders and infighting among the heirs, Ayman and Anas are risking destroying the value of Abudawood Group's most valuable asset.

64.     Through their actions as directors of the Abudawood Group, Ayman and Anas have harmed de Leon and AA by cutting them off from their rightful distributions and from freezing them out of the real properties in which they have ownership interests.  For nearly a year, they have been deprived of the use of their assets and property and access to capital.  In performing the acts described herein, the defendants acted with oppression, fraud and malice.

## FOURTH CAUSE OF ACTION
### (Constructive Fraud)

65.     Plaintiffs restate all allegations above as though fully recited herein.

66.     Between them, Defendants exercise control over a majority ownership interest in the Abudawood Group.  As the largest shareholders and directors of the Defendant Companies, including its wholly owned American subsidiaries in Delaware, Arizona, Michigan, Florida, North Carolina, and Colorado, Ayman and Anas have breached their duties by improperly pressuring de Leon and AA to force them to acquiesce to Defendants' management decisions, improperly cutting off distributions to which the Plaintiffs are entitled, freezing them out of access to real property to which they have an ownership interest, and preventing the heirs from disposing of their property as they see fit.  They have done this by delaying, obfuscating, and misrepresenting progress on settling the estate for their own improper purposes, including running out statutes of limitations around the world to attempt to prevent the heirs from receiving what they are entitled to under law, and placing the heirs in a position of economic duress to force them to accept the mismanagement of the Abudawood Group for the personal enrichment of Ayman and Anas. In performing the acts described herein, the defendants acted with oppression, fraud and malice.

## FIFTH CAUSE OF ACTION
### (Breach of Representative's Duties)

67.     Plaintiffs restate all allegations above as though fully recited herein.

68.     Ayman and Anas have personal duties to the estate of Sheikh Osama as they have been acting *de facto* as administrators of the estate as evinced by their June 22, 2017, letter to all of the heirs.

69.     As representatives of the estate, Ayman and Anas owe a duty of due care and prudence in administering the estate.  Here, where the Buyout was called for to (a) fulfill the wishes of the deceased and (b) to prevent the forced recapitalization of the Defendant Companies and related entities, Ayman and Anas

Case No.
COMPLAINT FOR DAMAGES

had a duty to hire an independent, competent firm to perform the valuation and finish the process in a timely manner.  Instead, they hired an entity over which they exert substantial influence that has no expertise in performing valuations of a large, complex multinational firm (Onyx's LinkedIn profile indicates they have between 11 and 50 employees total, and a letter from their CEO on their website indicates they specialize in small and medium enterprises).  The valuation has taken nearly a year and is still not complete.

70.     Based on representations made by Ayman, Anas, and Trinklein during the May 2, 2018 meeting, it is apparent that Ayman and Anas are using their influence over Onyx to prepare a sham and delayed valuation that will grossly undervalue the Abudawood Group, allowing Ayman and Anas to buy de Leon and AA out at a diminished price and to run out the clock.

71.     Ayman and Anas's efforts to create division among the heirs to satisfy their own greed have imperiled the estate and the Abudawood Group's most valuable asset: the licensing agreements and partnerships with Procter & Gamble and Clorox.  Finally, Ayman and Anas have further damaged the Plaintiffs by freezing them out of their homes, including residences in the Middle East, Europe, and the United States and misappropriating their assets.

### SIXTH CAUSE OF ACTION
#### (Breach of Oral Agreement)

72.     Plaintiffs restate all allegations above as though fully recited herein.

73.     Ayman and Anas orally promised Osama prior to his death that they would honor his wish of buying de Leon and AA out of the Abudawood Group and other assets at fair market value.  They repeated these promises personally, and through Trinklein, in numerous meetings with de Leon and her attorney, Ng.  They have reiterated their purported intent to buy de Leon and AA out at fair market value.  In return, and as valid consideration for these promises, De Leon executed broad power of attorney agreements, giving her power of attorney to Saudi lawyers

of Defendants' choosing.  De Leon performed fully under the agreement by giving up the valuable consideration of her power of attorney in reliance upon Defendants' promise that her interest in Abudawood would be bought for a fair price and using a fair process.  Defendants breached this agreement.  Defendants retained a biased and unqualified firm to present a lowball valuation of de Leon's interest and placed de Leon and AA in a position of financial duress (reducing the amount they can live on to less than 5% of what they had previously been accustomed to, and saddling them with immense and unnecessary "legal fees" charged by the attorney they coerced de Leon into giving power of attorney to and by charging their own legal fees to de Leon and AA).

74.    Ayman and Anas reneged on their agreement to Sheikh Osama and their oral agreement to de Leon and AA to carry out Sheikh Osama's wishes.  As the intended beneficiaries of those oral agreements, and having performed their obligations under the agreements, de Leon and AA seek to have them enforced.

75.    Ayman and Anas participated in conference calls with de Leon placed to her while she was in California and in calls with her attorney, also in California.  They repeated the claim that they intended that de Leon and AA's interests be protected in accordance with Sheikh Osama's wishes.  When de Leon sought a tolling agreement in order to allow for negotiations to proceed without fear that foreign time related defenses might apply, Ayman and Anas, through Trinklein, stated they were going to distribute the assets of the estate that were held in the Cayman Islands without the completed valuation.  They also indicated their intent to distribute certain Saudi assets, but have been unable to do so to date.  This attempt to bypass proper probate in the Cayman Islands and to force the distribution was done to accelerate the threat of recapitalization and to force de Leon and AA to accept a Buyout well below fair market value.

Case No.
COMPLAINT FOR DAMAGES

**SEVENTH CAUSE OF ACTION**
**(Promissory Estoppel)**

76.    Plaintiffs restate all allegations above as though fully recited herein.

77.    De Leon justifiably relied upon the promises made by Defendants in their letter to all of the heirs dated June 22, 2017.  Plaintiffs negotiated in good faith with Defendants in reasonable reliance upon the promises made in that letter. Plaintiffs have been injured as a result of that reliance through the loss of use and possession of their assets, the loss of distributions to which they were entitled, and exorbitant and unjustifiable expenses charged against their interests in the estate.

78.    De Leon justifiably relied on the oral promises made by Defendants to execute the Buyout at fair market value.  She gave power of attorney to the lawyers chosen by Defendants in reasonable reliance upon their promises and has suffered injury as a result.  Due to granting this power of attorney, the lawyers chosen by Defendants billed de Leon exorbitant fees for no substantive work.

**EIGHTH CAUSE OF ACTION**
**(Interference With Prospective Economic Advantage)**

79.    Plaintiffs restate all allegations above as though fully recited herein.

80.    De Leon and AA stand to benefit from their interest in Sheikh Osama's separate property as well as his interests in the Abudawood Group.  Anas and Ayman, by cutting off de Leon and AA's access to their rightful share of Sheikh Osama's estate, forcing de Leon to sign over a broad power of attorney to lawyers they control, and attempting to force de Leon and AA out of the Abudawood Group at a pittance, are tortiously interfering with de Leon and AA's economic interests in the corporate and legal entities that comprise Sheikh Osama's estate.

81.    Further, Ayman and Anas are interfering with de Leon and AA's rights to benefit from the relationships with Procter & Gamble and Clorox, as owners of substantial interests in the Abudawood Group' licensing rights.

82.    Finally, Ayman and Anas have disrupted de Leon and AA's income, by withholding income, distributions, dividends, and proceeds to which they are

Case No.
COMPLAINT FOR DAMAGES

rightfully entitled as Sheikh Osama's heirs and reducing their living allowance and standard of living by 95%.  These income, distributions, dividends, and proceeds are economic advantages that de Leon and AA derived from the Abudawood Group, including the Defendant companies, and Defendants have interfered with these rights.  In performing the acts described herein, the defendants acted with oppression, fraud and malice.

## NINTH CAUSE OF ACTION
### (Conversion)

83.    Plaintiffs restate all allegations above as though fully recited herein.

84.    Defendants have misappropriated and embezzled for their own purposes the lawful property of the Plaintiffs through the schemes described above. This includes wrongfully withholding the Plaintiffs' assets that are in the custody of the Defendants, through a fraudulent course of conduct designed to permanently deprive Plaintiffs of their rights of ownership and possession of their property. Defendants have also unlawfully converted and embezzled Plaintiffs' property by improperly charging their own personal expenses to the Plaintiffs' share of Sheikh Osama's estate.   In performing the acts described herein, the defendants acted with oppression, fraud and malice.

## TENTH CAUSE OF ACTION
### (Fraudulent Concealment)

85.    Plaintiffs restate all allegations above as though fully recited herein.

86.    Defendants, as acting administrators of Sheikh Osama's estate and as directors of the Company owe duties to all of Sheikh Osama's heirs and to the beneficial owners of the Company.  Plaintiffs belong to both categories.  Defendants have a duty to provide Plaintiffs with truthful information regarding the valuation of Sheikh Osama's estate.   Defendants, with knowing and fraudulent intent, have concealed this information from Plaintiffs in order to try to coerce Plaintiffs into accepting a Buyout for well below fair market value.  Plaintiffs have negotiated in good faith with Defendants for nearly a year, to their detriment, due to Defendants'

fraudulent concealment of materially important information about the Abudawood Group.  Over this period of negotiation, Plaintiffs have been deprived of the use and possession of their property and the distributions and dividends to which they are legally entitled.  In performing the acts described herein, the defendants acted with oppression, fraud and malice.

<u>**Prayer for Relief**</u>

Accordingly, Plaintiffs pray that the Court awards them the following relief:

1.      An injunction to prevent further distribution of the assets of the estate of Sheikh Osama outside of the regular judicial process;

2.      An accounting of the value of the Abudawood Group and Sheikh Osama's estate, performed by a qualified, independent firm with experience performing valuations of large, multinational companies;

3.      Specific performance of the oral agreement to buy out de Leon and AA's interests at fair market value;

4.      Treble damages under 18 U.S.C. §1964 for improperly withheld dividends and distributions;

5.      Treble damages under 18 U.S.C. §1964 for improper charges against de Leon and AA's share of the estate;

6.      Treble damages under 18 U.S.C. §1964 for lost use property and assets;

7.      Damages for pain and suffering caused by Defendants' intentional infliction of emotional distress;

8.      Punitive damages for Defendants' willful and malicious conduct;

9.      Attorneys' fees and costs under 28 U.S.C. §1964; and

10.      Any additional relief the Court deems just and proper.

Case No.
COMPLAINT FOR DAMAGES

1  DATED:  June 11, 2018

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Respectfully submitted,

QUINN EMANUEL URQUHART &
SULLIVAN, LLP


By _____/s/  Diane Cafferata_____
Diane Cafferata
Attorney for Plaintiffs ELEANOR
DELEON, individually, and as guardian ad
litem for AA, a minor

1

## <u>DEMAND BY JURY TRIAL</u>

2

Plaintiffs hereby demand trial by jury of all issues so triable.

3

4

5   DATED:  June 11, 2018                    Respectfully submitted,

6

7                                            QUINN EMANUEL URQUHART &
                                             SULLIVAN, LLP

8

9

10                                           By_____/s/  Diane Cafferata_____
                                                 Diane Cafferata
11                                               Attorney for Plaintiffs ELEANOR
                                                 DELEON, individually, and as guardian ad
12                                               litem for AA, a minor

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-30-                                         Case No.